UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ESTATE OF MADISON MILLER,
by and through Rita Miller and Jerame
Miller as co-personal representatives
of the estate, CORI MILLER,
RITA MILLER, JERAME MILLER,

                      **Plaintiffs,**

-vs-                                      Case No. 6:07-cv-1358-Orl-19DAB

**TOYOTA MOTOR CORPORATION,
THRIFTY RENT-A-CAR SYSTEM, INC.,
JOHN DOE MANUFACTURER,**

                      **Defendants.**

## ORDER

This case comes before the Court on the following:

1. Order Permitting Limited Jurisdictional Discovery and Directing the Parties to File Renewed Motions for Amendment of the Court's Order (Doc. No. 63, filed Mar. 31, 2008);

2. Renewed Motion by Toyota Motor Corporation to Dismiss Plaintiffs' First Amended Complaint Pursuant to F.R.C.P. 12(b)(1) and Memorandum of Law in Support Thereof (Doc. No. 91, filed June 16, 2008);

3. Supplemental Motion by Plaintiffs to Correct the Record and Assert Personal Jurisdiction over Toyota Motor Corporation (Doc. No. 93, filed June 17, 2008);

4. Response by Toyota Motor Corporation to Plaintiffs' Supplemental Motion Regarding Personal Jurisdiction over TMC (Doc. No. 95, filed July 1, 2008);

5.  Opposition by Plaintiffs to Toyota Motor Corporation's Renewed Motion for Dismissal Pursuant to F.R.C.P. 12(b)(2) (Doc. No. 97, filed July 2, 2008);

6.  Notice by Toyota Motor Corporation of Filing Opinion of Sixth Circuit Court of Appeals Affirming Dismissal Based Upon Lack of Jurisdiction and *Forum Non Conveniens* (Doc. No. 100, filed Aug. 4, 2008); and

7.  Notice by Toyota Motor Corporation of Filing of and Intent to Rely Upon Plaintiffs', Rita Miller and Jerame Miller, Responses to Defendant's, Thrifty Rent-A-Car System, First Set of Interrogatories (Doc. No. 101, filed Sept. 10, 2008).

**Background**

**I.  Procedural History**

This Court's previous Orders explain the procedural history and general background of this wrongful death action in detail. (Doc. No. 41, filed Dec. 18, 2008; Doc. No. 55, filed Feb. 22, 2008; Doc. No. 63; Doc. No. 73, filed Apr. 22, 2008.) The facts relevant to the instant Motions can be summarized briefly.

Madison Miller was killed in a helicopter crash while being airlifted to a hospital for injuries she sustained during a car accident in South Africa. (Doc. No. 41 at 2-4.) Her estate and several members of her family (seeking derivative damages from her death) sued Thrifty Rent-a-Car-System and Toyota Motor Corporation ("TMC") in this Court. (*Id.*) On February 22, 2008, the Court granted TMC's Motion to Dismiss the claims against it. (Doc. No. 55.) The Court found that TMC did not possess sufficient contacts under Florida's long-arm statute to submit the corporation to

general personal jurisdiction in this Court.[1] (*Id.* at 7-12.) While evaluating TMC's contacts with Florida, the Court came to the following factual conclusions:

> TMC does not sell or import vehicles to Florida, or even to the continental United States. Rather, TMC's operations appear to be focused on designing vehicles for markets in Asia and Africa.
>
> TMC emphasizes that it . . . does not sell or design vehicles for United States markets or Florida in particular . . . .

(*Id.* at 3, 8-9.) The Court drew these conclusions from the following statements in an affidavit submitted by a TMC employee:

> 4.  TMC is located in Japan, and does not import, market or sell Toyota motor vehicles in the continental United States or in particular in Florida.
>
> 16. TMC has never designed or manufactured Toyota motor vehicles in Florida.
>
> 28. TMC designed this vehicle [the Toyota Condor at issue] for Asian and African markets, and this vehicle was manufactured by a TMC affiliated company in South Africa.

(Doc. No. 36-2 at 2-4.)

On March 11, 2008, TMC filed a Motion to Amend the Court's Order. TMC stated that the above quoted statements from the Court's Order were inaccurate. (Doc. No. 59, filed Mar. 11, 2008.) Regarding the Court's conclusion that "TMC does not sell or import vehicles to Florida," TMC suggested that the Court "substitut[ed]" the words "for" and "to" for the word "in," coming to an incorrect conclusion. (*Id.* at 2.) TMC also suggested that the Court's statement that "TMC's operations appear to be focused on designing vehicles for markets in Asia and Africa" was not

---

[1] The relevant portion of the statute provides jurisdiction over "a defendant who is engaged in substantial and not isolated activity within this State, whether such activity is wholly interstate, intrastate, or otherwise . . . whether or not the claim arises from that activity." Fla. Stat. § 48.193(2) (2007).

contained anywhere in the record and is a misinterpretation of TMC's statement regarding the Toyota Condor. (*Id.* at 3.) TMC requested that the Court amend its Order for the sake of accuracy but leave the ultimate legal conclusions unchanged. (*Id.* at 3-4.)

The same day, Plaintiffs filed a Motion for Reconsideration, arguing that TMC's Motion asking the Court to reconsider its previous Order had brought new evidence to light. (Doc. No. 58 at 1-2, filed Mar. 11, 2008.) Plaintiffs also asked the Court to grant jurisdictional discovery by permitting them to take the depositions of two TMC employees. (*Id.* at 3.) Finally, Plaintiffs opposed TMC's Motion to amend the Court's Order, arguing that TMC's proposed amendments affect the Court's legal reasoning and warrant a change in outcome. (Doc. No. 62, filed Mar. 28, 2008.)

The Court agreed with TMC that the Order contained factual inaccuracies. (Doc. No. 63 at 3.) However, the Court disagreed that the error resulted from a "simple case of substitution, as TMC suggest[ed]." (*Id.*) Rather, the affidavits that TMC submitted were somewhat obtuse in their choice of language, causing the Court to adopt a different interpretation of the above-quoted passages than the witnesses apparently intended. (*Id.* at 3-4.) Concerned about the completeness and accuracy of the record, the Court granted Plaintiffs limited jurisdictional discovery and instructed the parties to file renewed motions for amendment, if appropriate. (*Id.* at 5.) The Order explained that any such motion was required to: "(1) identify any new factual information discovered during the depositions; (2) explain, with specific citations to the Court's previous Order, how any new factual information changes the Court's factual conclusions; and (3) explain, with specific citations to the Court's previous Order, how any new factual conclusions change the Court's legal conclusions." (*Id.* at 5-6.) Both parties filed renewed Motions.

**II.     Results of the Jurisdictional Discovery**

Plaintiffs have identified four factual issues which they contend change the outcome of the personal jurisdiction issue. (Doc. No. 93 at 8.) TMC argues that the none of the newly discovered facts warrant a change in the Court's conclusion that TMC is not subject to personal jurisdiction. (*See* Doc. Nos. 91, 95.)

The first two issues that Plaintiffs identify relate to TMC's role in the design, manufacture, marketing, and sale of the Toyota and Lexus vehicles that are sold and driven throughout Florida. (Doc. No. 93 at 8.) As discussed above, the Court's previous Order was inaccurate to the extent the Court concluded that TMC did not manufacture the Toyota and Lexus brand vehicles which are sold in Florida and in the continental United States markets. The Order also erred by concluding that TMC's operations appeared to be focused on Asian and African markets.

According to the deposition of a corporate representative, TMC manufactures vehicles destined for the United States market. (Ex. G at 11-12.)[2] TMC sells these vehicles to Toyota Motor Sales ("TMS") in Japan. (*Id.*) TMS is the entity that actually imports the vehicles to the United States. (*Id.*) Some of these vehicles are then sold to a privately-held company named South East Toyota Distributors ("SET"), and then apparently distributed to dealers and ultimately sold to consumers in Florida. (Ex. H at 37.) Approximately 200,000 of the imported vehicles are sold in Florida each year. (Ex. G at 12.) There is no direct evidence that vehicles are specially designed for the Florida market. However, TMC sends employees to the United States to conduct focus groups, reimburses TMS for certain warranty claims, and has the ability to recall products that were

---

[2] The jurisdictional discovery materials that were submitted to the Court are sealed. Accordingly, citations to these materials will be to the exhibit name as reflected in the Exhibit List submitted by Plaintiffs.

sold in the United States. (*See* Ex. C; Ex. G at 34.) In addition, TMC designs vehicles which are manufactured by American subsidiaries. (Ex. G at 32-34.)

The third factual issue concerns the amount of revenue TMC generates from the Florida market. TMC previously represented to the Court that less than one percent of its revenue could be attributed to Florida. (Doc. No. 36-2 at 3 ("TMC derives less than 1% of its income from the State of Florida.").) Jurisdictional discovery revealed that TMC has no idea how much of its revenue can be attributed to Florida. According to the estimate of Plaintiff's expert economist, TMC has derived approximately $71,000,000 in revenue per year from Florida over the last eight years. (Ex. F.) However, one of TMC's deposition witnesses emphasized that TMC does not track the sales of its cars in Florida. (Ex. G. at 11-12, 22-33.) Thus, TMC does not calculate the portion of its revenue that is attributable to Florida. (*Id.*)

The final factual issue relates to the amount of control that TMC exercises over its American subsidiaries. Based on TMC's representations, the Court previously concluded that TMC gives no instruction to TMS regarding the design, manufacture, or testing of vehicles, and that TMS personnel direct the day-to-day operations of TMS. (*See* Doc. No. 36-3 at 3.) Jurisdictional discovery provided additional evidence regarding the relationship between the two corporations. According to the import agreement between TMC and TMS, TMC is permitted to set TMS' sales figures. (Ex. at 5-6.) In addition, the agreement states that TMC may provide TMS with "advice and guidance" which TMS must follow. (*Id.* at 10-11.)

**Analysis**

There is no doubt that TMC has some contact with the State of Florida. The dispute between the parties appears to concern how these contacts should be characterized and what weight should

be given to each contact. The ultimate question is whether TMC's contacts, "considered collectively[,] . . . show a general course of business activity in the State [of Florida] for pecuniary benefit."[3] *Stubbs v. Wyndham Nassau Resort & Crystal Palace*, 447 F.3d 1357, 1361 (11th Cir. 2006) (quoting *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996); *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So. 2d 561, 564 (Fla. 1975)). To track the exact language of the statute, the Court may assert personal jurisdiction over TMC if it "engaged in substantial and not isolated activity within [Florida] . . . ." Fla. Stat. § 48.193(2).

I.  **The Weight Given to Various Contacts**

   A.  **TMC's Role in the Design, Manufacture, Sale, and Marketing of Vehicles Sold in Florida**

The central dispute over the new evidence is to what extent it demonstrates that TMC intended for approximately 200,000 of its vehicles to be sold in Florida each year, and how much weight such evidence of intent should be given in the general personal jurisdiction analysis. (*See* Doc. No. 93 at 8-10.) TMC contends that it merely sells the vehicles to TMS in Japan and has no control over how the vehicles are sold in the United States. (Doc. No. 91 at 15-18.) Plaintiffs argue that TMC actually intends for at least some of these vehicles to be sold in Florida. (Doc. No. 93 at 9-10.) Therefore, Plaintiffs argue, TMC has engaged in substantial and not isolated activity in the State of Florida through its participation in the market.

---

   [3] The quoted language actually appears to be derived from Florida state court cases interpreting section 48.193(1) of the Florida Statutes, a provision allowing specific jurisdiction for claims relating to a defendant's business activities. *See Dinsmore*, 314 So. 2d at 564. However, the *Stubbs* court adopted this standard for its analysis of general jurisdiction under section 48.193(2).

Both parties provide factual support for their arguments. However, the Court need not determine what TMC actually intended with respect to the vehicles it placed in the stream of commerce. *C.f.*, *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 102-22 (1987) (plurality opinion reaching three different conclusions on the extent of awareness required on the part of the manufacturer to subject the manufacturer to personal jurisdiction). Plaintiffs conflate the concepts of specific personal jurisdiction and general personal jurisdiction by relying on the stream of commerce theory.

As several courts have explained, the stream of commerce theory has little relevance in a general personal jurisdiction analysis. *Knowledgeaz, Inc. v. Jim Walter Res., Inc.*, 452 F. Supp. 2d 882, 895 (S.D. Ind. 2006) ("This argument confuses specific and general jurisdiction. Under [the plaintiff's] theory, [the defendant] would be subject to worldwide jurisdiction in any case . . . ."); *Wexco v. Diesel Equip.*, No. CIV06-cv-02106(WHW), 2006 WL 2355396, at *6 (D.N.J. Aug. 14, 2006) ("The rationale of *Asahi* does not extend to the outer contours of the more expansive general jurisdiction doctrine."). Rather, the theory is relevant to whether the seller has "purposefully availed" itself of the minimum contacts needed for a court to constitutionally assert specific personal jurisdiction. *Asahi*, 480 U.S. at 109-112. The rationale behind the rule is that specific personal jurisdiction must comport the requirement of fair notice, and a defendant therefore should not be haled into a distant forum for suits related to a product unless it actually had some level of awareness that its product would end up in that forum. *See id.*; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). When a defendant is physically present in the forum, or has continuous, systematic contacts with the forum, there is no concern that the defendant will be caught by surprise

when it is required to defend a lawsuit there.[4] Thus, the stream of commerce theory is of little use when determining whether the defendant engages in the much more extensive amount of activity required to establish general personal jurisdiction under a long-arm statute.

There is no dispute that TMC does not have retail or marketing operations in Florida. These tasks are carried out by its subsidiaries and privately-held corporations. At most, the fact that vehicles manufactured by TMC are present in Florida is a relevant, but weak and indirect contact, with the State. It is not a substitute for showing that TMC is directly active in the marketplace. *See* Fla. Stat. § 48.193(2) (allowing the assertion of personal jurisdiction over a "defendant who is engaged in substantial and not isolated *activity* within this state, whether such activity is wholly interstate, intrastate, or otherwise . . . whether or not the claim arises from that activity." (emphasis added)).

### B. TMC's Profit

Plaintiffs also argue that TMC's receipt of $71,000,000 in pre-tax profit from the Florida market establishes a strong contact with Florida. (Doc. No. 93 at 11.)

However, Plaintiffs misplace their heavy reliance on TMC's receipt of pre-tax profit. As the evidence demonstrates, these earnings are indirectly derived from the State of Florida. (Ex. F.) There is no dispute that TMC generates the profit through its sale of vehicles to TMS in Japan. TMC's indirect profit from Florida, whether it be $71 million or $71 billion, cannot serve as a proxy

---

[4] Nevertheless, at least one Florida District Court of Appeals case applied the purposeful availment test when determining whether general jurisdiction was available under section 48.193(2) of the Florida Statutes. *Argueta v. Suzuki Motor Co., Ltd.*, 609 So. 2d 635, 636-37 (Fla. 3d DCA 1992). However, the court decided the issue by concluding that the assertion of jurisdiction under the statute would be unconstitutional because the plaintiff's allegations did not establish the existence of constitutionally-sufficient minimum contacts. *Id.*

for actually engaging in business *activity* in Florida. *See* Fla. Stat. § 48.193(2); *Stubbs*, 447 F.3d at 1361. Thus, TMC's Florida-generated profit is another relevant, but weak and indirect, contact with the State.

### C. TMC's Control over its American Subsidiaries

Finally, Plaintiffs contend that TMS is an alter-ego of TMC and its contacts with Florida should therefore be imputed to TMC. (Doc. No. 93 at 12-16.) Plaintiffs' central argument is that TMS is independent only "on paper." However, paper matters in the law governing corporations. One of the key purposes of incorporation is to protect the shareholders from the corporation's liabilities. This concept applies in the context of asserting personal jurisdiction over a parent corporation by virtue of its subsidiary's contacts. *Stubbs*, 447 F.3d at 1361-63. As discussed in the Court's earlier Order, the contacts of subsidiary corporations are imputed to the parent corporation only when the subsidiary acts as the parent's alter ego. (Doc. No. 55 at 10-11.)

Plaintiffs attempt to establish that TMS is an alter-ego of TMC because TMC "loans" employees to TMS, TMC exerts some control over TMS' business plans, and TMC places conditions on TMS through an import agreement. However, this new evidence fails to change the Court's conclusion that TMC's subsidiaries do not function as alter-egos.

First, as explained in the Court's previous Order, the intermingling of corporate officers and board members is a common occurrence in the parent-subsidiary relationship, and it does not establish that the subsidiary is the alter-ego of the parent corporation. (*Id.*) Further, the fact that TMC acts as a parent corporation by exercising some control over TMS is insufficient to establish that TMS is an alter-ego of TMC. The relevant inquiry is whether the level of control is so extensive that the subsidiary "functions solely to achieve the purpose of the dominant corporation." *Stubbs*,

447 F.3d at 1362. A second, related inquiry is whether TMC would simply step in and perform the activities of its American subsidiaries in their absence. *Wiwa v. Royal Duch Petrol. Co.*, 226 F.3d 88, 95 (2d Cir. 2000). The Court previously concluded that neither of these tests were met. (Doc. No. 55 at 10-11.) The additional evidence gathered does not change this result. It is neither surprising nor improper that the majority shareholder of a corporation would exert some influence over the corporation's business activities.[5] Corporations function to make a profit for shareholders, and shareholders are given a right to control the corporation. Plaintiffs have not demonstrated that TMC has gone beyond the typical role of a dominant shareholder and turned TMS or its other American subsidiaries into alter-egos.

Finally, TMC's import agreement with TMS establishes conditions that TMS, as an importer of TMC's products, must meet. (*See* Ex. A.) It is not uncommon for producers to place demands on downstream distributors and retailers of their products. Shortcomings at the point of sale reflect on the brand name, and consumer dissatisfaction can damage the producer just as easily as it can damage the retailer responsible for the problem. *See, e.g.*, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 (1977) ("Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product."). In addition, the fact that TMC felt it necessary to draft a twenty-eight page import agreement to govern its relationship with TMS further illustrates that TMS does not function as a mere alter ego of TMC.

---

[5] To be completely accurate, TMC is the majority shareholder of a holding company named Toyota Motor North America ("TMA"). TMA is the majority shareholder of TMS. (Ex. H at 95.)

Accordingly, the contacts of TMC's American subsidiaries cannot be imputed to TMC. The evidence of TMC's direction of TMS is relevant only to the extent it demonstrates that TMC, itself, has engaged in business in the forum. However, the Court notes that none of TMC's activities with respect to controlling TMS or other subsidiaries actually occurred in Florida or specifically relate to Florida.

## II.     Aggregation of the Relevant Contacts

As explained in this Court's previous Order, TMC is subject to general personal jurisdiction if its actions, "considered collectively[,] . . . show a general course of business activity in the State for pecuniary benefit." *Stubbs*, 447 F.3d at 1361.

The additional evidence gathered by Plaintiffs is insufficient to elevate TMC's activity to a "general course of business activity" in Florida. Plaintiffs place the most weight on indirect contacts which, even when aggregated, provide a very weak case for jurisdiction. Beyond these indirect contacts, there is very little evidence that TMC itself has conducted "activity" in Florida, as the long-arm statute specifically requires. *See* Fla. Stat. § 48.193(2). The only evidence of TMC's activity in Florida is that several TMC executives have traveled to Florida for purposes unrelated to business in Florida, that TMC has held a focus group in Florida, that TMC has three employees "on loan" to TMS in Florida, and that TMC has defended lawsuits in Florida. (Ex. G at 17; Ex. H at 34-35, 88; Doc. No. 93 at 5.) These activities are too sporadic to "show a general course of business activity in the State for pecuniary benefit," *Sculptchair, Ltd.*, 94 F.3d at 627, or to constitute "substantial and not isolated activity" within the State. Fla. Stat. § 48.193(2).

Accordingly, TMC is not subject to personal jurisdiction under Florida's long-arm statute, and the claims against it must be dismissed without prejudice. *See Ahern v. P. Gulf Marine, Inc.*, No. 8:06-CV-2068-T-27MSS, 2008 WL 706501, at *3 (M.D. Fla. Mar. 14, 2008) (collecting cases analyzing general personal jurisdiction under Florida's long-arm statute).[6] The Court does not reach the questions of whether the assertion of personal jurisdiction would be constitutional or whether the action should be dismissed under the doctrine of *forum non conveniens.*

## Conclusion

The Renewed Motion by Toyota Motor Corporation to Dismiss Plaintiffs' First Amended Complaint Pursuant to F.R.C.P. 12(b)(1) and Memorandum of Law in Support Thereof (Doc. No. 91, filed June 16, 2008) is **GRANTED**, and the Supplemental Motion by Plaintiffs to Correct the Record and Assert Personal Jurisdiction over Toyota Motor Corporation (Doc. No. 93, filed June 17, 2008) is **DENIED**. The Court **AMENDS** its Order at Docket Number 55, filed February 22, 2008, as stated in this Order. However, the Court's holding that Toyota Motor Corporation is not subject to personal jurisdiction remains unchanged.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on October 3, 2008.

---

[6] In a companion case arising from the same South African accident, the Sixth Circuit recently came to the same conclusion with regard to TMC's contacts with Ohio. *Estate of Thompson v. Toyota Motor Corp. Worldwide*, No. 07-cv-3813, 2008 WL 2952784, at *2-5 (6th Cir. July 30, 2008). Although the Sixth Circuit rendered the decision without considering the jurisdictional discovery that has occurred in this case, and the case concerned TMC's contacts with a different state, the court's analysis on the issue of personal jurisdiction is instructive to the issues presented here.

*[Signature]*

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record