ESTATE OF MADISON MILLER, by and
through Rita Miller and Jerame Miller as co-
personal representatives of the estate,
CORI MILLER, RITA MILLER,
JERAME MILLER, MICHAEL MILLER,

                Plaintiffs,

-vs-                                        Case No.  6:07-cv-1358-Orl-19DAB

THRIFTY RENT-A-CAR SYSTEM, INC.,
JOHN DOE MANUFACTURER,

                Defendants.
_____

# ORDER

This case comes before the Court on the following:

1.      Consolidated Motion for Summary Final Judgment of Defendant Thrifty Rent-A-Car System, Inc. and Memorandum of Law (Doc. No. 184, filed Apr. 1, 2009);

2.      Motion of Plaintiffs for Partial Summary Judgment (Doc. No. 185, filed Apr. 1, 2009);

3.      Response of Defendant in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Memorandum of Law (Doc. No. 191, filed Apr. 13, 2009); and

4.      Response of Plaintiffs in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 198, filed May 2, 2009).

# Background

This case arises from the death of Madison Miller after she suffered injuries during a car accident in South Africa.[1] Her family rented the car from a Thrifty Rent-A-Car, Inc. ("Thrifty") franchise in South Africa operated by a company called SAFY Trust ("SAFY"). The cross Motions currently before the Court seek summary judgment on the dispositive issue of whether Thrifty is vicariously liable for SAFY's provision of an allegedly defective vehicle.

The facts summarized below are undisputed, except where otherwise indicated. SAFY is a South African "trust company" run by four brothers, Shiraz, Asif, Farouk, and Yunis Moola. (Doc. No. 184-2 at 3.) Along with two affiliated corporations, Springs Car Wholesalers and Buzz Car Rentals, (*id.* at 3-4), SAFY ran an independent car rental service until it entered into a licensing agreement with Thrifty in 2003, (Doc. No. 184-9 at 2). That agreement allows SAFY to use Thrifty's trade dress and centralized reservation system in the countries of South Africa and Namibia. (Doc. No. 185-7.) Relevant portions of the twenty-seven page agreement are set forth as follows:

- Section 201 of the Agreement, entitled "Grant of License," grants to the "Master Licensee" a license to use Thrifty's "System and Marks." The section also grants an exclusive territory to the licensee provided that the licensee "strictly complies" with the licensing agreement. The licensee is permitted to grant a sub-license. (*Id.* at 8-9.)

---

[1] The general background of the case is set forth in greater detail in this Court's previous Orders. *E.g.*, *Estate of Miller v. Thrifty Rent-A-Car Sys., Inc.*, No. 6:07-cv-1358-Orl-19DAB, — F. Supp. 2d —, 2009 WL 975570, at *1 (M.D. Fla. Apr. 10, 2009); *Miller v. Toyota Motor Corp.*, 593 F. Supp. 2d 1254, 1254 (M.D. Fla. 2008); *Estate of Miller v. Thrifty Rent-A-Car Sys., Inc.*, No. 6:07-cv-1358-Orl-19DAB, 2008 WL 4525058, at *1 (M.D. Fla. Oct. 6, 2008).

- Section 202(A), entitled "Operating Manuals" requires "strict compliance" with an operating manual provided by Thrifty.[2] (*Id.* at 9-10.)

- Section 203, entitled "Licensor's Operating Obligations," sets forth a number of "obligations" to which the licensee must adhere. First, subsection (A) states that the licensor will provide to the licensee a set of operating supplies, including "materials used for Fleet and Station identification; (2) promotional materials prepared by Licensor; (3) mandatory forms and supplies; and (4) directories of Stations." Next, subsection (B) states that "training" will be provided to the licensee for no fee to instruct the licensee how to use the "Licensed System." Subsection (C) describes the "Reservation System" in which the licensee must participate. The subsection allows Thrifty to require the licensee to act as a "clearinghouse" for reservations to and from the licensee's exclusive territory. (*Id.* at 10.)

- Section 204 is labeled "Obligations of the Master Licensee and Sublicensees." Subsection (A) states that "Master Licensee and Sublicensees in the Territory are independent businesses and must identify and present themselves as such to Customers and others." The subsection prohibits the licensees from using the trademarks, "TRAC," "DRAC," "DTG," and "DTAG." Further, the subsection requires a licensee to indicate that it is "an independent licensee" in all advertising, business documents, and government filings. Each rental station is required to have a "prominent sign" indicating that the location is part of an independent business. Licensees are prohibited from presenting themselves as agents of Thrifty. (*Id.* at 11.)

_____

[2]    The operating manual is not included in the record. From the language of Section 202(A), the manual appears to primarily concern the licensee's use of Thrifty's trademarks.

- Section 204, subsection (D) is entitled "Conduct of Business" and prescribes twelve conditions that the licensee must meet. These include: each station must have a full time manager; each station must have a separate telephone number for customer calls; each station must be "clean, orderly, and safe"; each station must use rental agreements approved by Thrifty; the licensee must comply with Thrifty's "customer system dispute resolution program"; and the licensees must not use multiple trademarks. (*Id.* at 12.)

- Section 204, subsection (E) provides that the licensees are free to determine their own rates for vehicle rentals, provided that they honor special rates and participate in frequent flier programs. (*Id.* at 12-13.)

- Section 204, subsection (F) requires licensees to participate in Thrifty's reservation system. (*Id.* at 13.)

- Section 204, subsection (G) governs the licensee's vehicle fleets. The subsection requires that the vehicles "must be maintained, at a minimum, in accordance with manufacturer's recommendations, and must be safe, clean, presentable, in first-class mechanical and running order and in compliance with applicable law." Each station must accept and service vehicles of other licensees, with the right to receive reasonable compensation for such service. The subsection requires that any service must "minimize delay and inconvenience" to customers. (*Id.*)

- Section 204, subsection (H) governs the interior and exterior design of the licensee's stations. It requires the licensee to prominently display the marks and logo of the licensed system with no other mark or logo being used. However, all promotional materials and forms must state somewhere that the licensee is an "independent licensee." (*Id.*)

-4-

- Section 204, subsection (I) requires the licensee to carry insurance. (*Id.*)

- Section 204, subsection (J) requires the licensee to actively promote its business in regular and classified telephone directories, provided that it identifies itself in such advertisements as an independent licensee. The licensee is also required to contribute to an advertisement fund, as set forth by a separate schedule, and Section 403 of the agreement specifies that the licensee and Thrifty may mutually agree to initiate an advertising assessment that does not exceed 2% of gross proceeds. The licensee must provide promotional material to Thrifty in advance for approval. (*Id.* at 13-14.)

- Section 301 is entitled "Performance Standards." Subsection (A) requires the licensee to use "best efforts" to develop its business within its territory. Certain benchmarks for revenue and number of locations are set forth in an attached schedule. Subsection (D) requires the licensee to have a vehicle fleet that meets the minimum amount of vehicles set forth in the schedule. (*Id.* at 17.)

- Section 604 is entitled "Indemnification" and requires the licensee to indemnify Thrifty against liability arising from the licensee's conduct of its business. (*Id.* at 26.)

- Section 605, subsection (k) provides that the parties to the agreement "are independent contractors[,] and no training, assistance or supervision . . . shall defeat this status." (*Id.* at 27.)

The record contains conflicting evidence concerning the degree to which SAFY complied with the obligation to identify itself as an independent licensee. During her deposition, Colleen Miller testified that she saw only Thrifty's name upon entering the Port Elizabeth location from which the Millers rented the car; however, she was not asked specifically whether the location

featured a sign indicating that Thrifty was an "independent licensee."[3] (Doc. No. 185-5 at 3.) The phonebook advertisement for the Port Elizabeth location does not identify the location as an independent licensee, and the employees at the location are instructed to answer the phone, "Thrifty Rent-A-Car." (Doc. No. 184-3 at 4; Doc. No. 185-3.) Both Rita and Colleen Miller testified that they believed they were renting a car from "Thrifty," apparently unaware that they were dealing with a franchise. (Doc. No. 185-2 at 4; Doc. No. 185-5 at 3.) During her deposition, Leanne Gilchrist, the rental manager of SAFY, testified that the Port Elizabeth location featured a sign behind the counter indicating that the location was run by Springs Car Wholesalers. (Doc. No. 184-3 at 4-5.)

---

[3]     In their Motion for Partial Summary Judgment, Plaintiffs aver that "[a]ll of the testimony in this case has been that the required sign [specifying that the location was independently owned and operated] was not present in the Port Elizabeth Thrifty location," and they cite to the depositions of Rita and Colleen Miller as support. (Doc. No. 185 at 5.) However, the cited portion of Rita Miller's testimony specifies only that she saw a sign in the rental station for "Thrifty," not that the store lacked a separate sign which indicated that the location was  independently owned. (Doc. No. 185-2 at 9.) Further, the cited portion of Colleen Miller's testimony explains that she did not see any other "names" at the store "besides Thrifty," but she was not asked whether she saw a sign indicating that the store was an independently owned business. (Doc. No. 185-5 at 9.) Finally, contrary to Plaintiffs' assertion, there is testimony in the record that the required sign was indeed present at the Port Elizabeth location.   (Doc. No. 184-3 at 4-5.)

       This is the second significant misrepresentation Plaintiffs have made to the Court. (*See* Doc. No. 190 at 8 n.7 (noting that Plaintiffs misstated the law of Oklahoma by claiming that it "does not provide a defendant with the option of apportioning liability to a non-defendant").) Such misrepresentations, even when simply the product of carelessness, violate the ethical rules which govern the conduct of attorneys before federal courts. *E.g.*, *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 819 (7th Cir. 1987) ("A lawyer must distinguish a fact from an inference he seeks to press on the court. It is unprofessional conduct to represent inferences as facts.  Misleading representations, whether deliberate or careless, misdirect the attention of other lawyers and the district judge." (citations omitted)).  Plaintiffs are given notice that future misrepresentations will result in sanctions under Federal Rule of Civil Procedure 11.

The rental contract between Rita Miller and SAFY features the logos of "Buzz Car Rental" and "Sani Van Rentals"[4] alongside the logos of Thrifty and its affiliate, Dollar. (Doc. No. 184-8 at 1.) The words "South African Licensee, Springs Car Wholesalers cc" appear to the right of the logos. (*Id.*) The back of the agreement, which lists specific terms and conditions, indicates that the lessor is "Springs Car Wholesalers cc." (*Id.* at 2.) Yunis Moola's business card states that the rental agency is an "independent licensee" of Thrifty. (Doc. No. 184-2 at 41.)

Thrifty oversees the operations of its licensees to insure proper compliance with trade dress and branding. (Doc. No. 184-5 at 2-3.) When new locations are opened, Thrifty requires photographs of the location to be sent to the Thrifty headquarters to ensure compliance with the license agreement's provisions regarding trade dress. (*Id.*) However, the file on the Port Elizabeth location did not contain any photographs of a sign indicating that the location was independently owned and operated. (*Id.*) Richard Ault, Thrifty's operations manager, testified that compliance with the trade dress requirements was important because "[t]he brand is important to our business[,] and it needs to be a professionally presented brand and consistent." (Doc. No. 184-9 at 4.) On the other hand, both Ault and Yunis Moola testified that Thrifty does not oversee any other aspects of SAFY's business operations. For instance, Ault testified, "any tour rate, any retail rate, any corporate rate is for the licensee to set. We do not attempt to run their business or understand their costs, their overheads, their acquisition of vehicles." (*Id.* at 6.) Yunis Moola testified that Thrifty's

---

[4]    The Court is unaware of any testimony that clearly explains the relationship between "Sani Van Rentals" and SAFY. It appears, however, that SANI Van Rentals is affiliated with SAFY much in the same manner as Buzz Car Rental and Springs Cars Wholesalers. (*See* Doc. No. 184-8 at 1.)

primary concern is that they "get their money on time." (Doc. No. 184-2 at 32.) Moola stated that it was his responsibility to "make sure that [he] buy[s] good cars." (*Id.*)

## Standard of Review

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand,

summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## Analysis

### I.     Scope of the Summary Judgment Motions

Thrifty has filed a Motion for "Summary Final Judgment" seeking summary judgment on three grounds, one of which is the lack of an agency relationship between SAFY and Thrifty.[5] (Doc. No. 184.) In that Motion, Thrifty states that Plaintiffs' allegations against it for negligence, strict liability, and breach of warranty are all "premised upon Plaintiffs' assertions that the SAFY Trust was an agent of Thrifty." (*Id.* at 2.) Plaintiffs respond by arguing that an agency relationship exists, but they do not refute Thrifty's assertion that their claims depend entirely on the establishment of an agency relationship between Thrifty and SAFY. (Doc. No. 191 at 2-5, 11-13.) Further, despite the fact that Thrifty seeks summary judgment on all claims, plaintiffs present no evidence or argument regarding Thrifty's direct liability for the conduct alleged in the Amended Complaint.

Summary judgment is an appropriate mechanism to narrow the scope of a plaintiff's claims. *In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995) ("Pretrial procedures such as summary judgment (Fed. R. Civ. P. 56) and the motion for a more definite statement (Fed. R. Civ. P. 12(a)) are the appropriate devices to narrow the issues and disclose the boundaries of the claim or defense."). Based on the parties' Motions, Responses, and the lack of any evidence in the record

---

[5]     Thrifty also seeks summary judgment on the grounds that Madison Miller's injuries were unforeseeable and that Plaintiffs contractually released their claims against Thrifty. Plaintiffs seek "partial summary judgment" on the issues of whether SAFY served as an agent of Thrifty and whether the accident was foreseeable. Because the agency issue is dispositive of Plaintiffs' claims, the Court will not address these additional issues.

demonstrating a basis to hold Thrifty directly liable, the Court concludes that Plaintiffs' claims are now premised entirely on vicarious liability through the existence of an alleged agency relationship between SAFY and Thrifty. *See Crenshaw v. Lister*, 556 F.3d 1283, 1291 n.3 (11th Cir. 2009) (arguments not raised in response to a summary judgment motion are considered abandoned) (citing *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n. 1 (11th Cir. 2001), *aff'd after remand*, 430 F.3d 1326 (11th Cir.2005)).

Furthermore, even if Plaintiffs have not abandoned their direct liability claims, they have failed to "make a showing sufficient to establish the existence of an element essential" to these claims, *Celotex Corp.*, 477 U.S. at 322, namely that Thrifty took any action that directly caused their injuries. As the party opposing summary judgment, Plaintiffs have a burden to come forward with evidence that creates a genuine issue of material fact with respect to each of their claims. The entire record has been examined and no evidence supporting their direct liability claims against Thrifty has been found. For instance, Plaintiffs have not presented evidence that Thrifty played any role in the selection or maintenance of the particular vehicle that caused Plaintiffs' injuries sufficient to support a negligence action. *E.g.*, Restatement (Second) of Torts § 281 (1965) (elements of a negligence action). In addition, Plaintiffs have presented no evidence suggesting that Thrifty created an express or implied warranty, and they have not come forward with any evidence sufficient to support a cause of action for strict liability. *E.g.*, Restatement (Third) of Torts: Products Liability §§ 1-2 (1998) (requirements of a products liability claim). Accordingly, summary judgment in Thrifty's favor is appropriate on Plaintiffs' direct liability claims.

## II.     Choice of Law

As explained in previous Orders, nearly every legal issue in this case requires a choice of law analysis, and as the parties recognize, the issue of agency is no exception. However, before beginning a choice of law analysis, a court should determine whether a conflict of laws truly exists. *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 & n.21 (11th Cir. 1995); *Federacion Nacional Autonoma de Futbol de Honduras v. Traffic Sports USA, Inc.*, No. 08-21505-MC, 2008 WL 4056295, at *3 (S.D. Fla. Aug. 29, 2008) (citing *Tune v. Phillip Morris, Inc.*, 766 So.2d 350, 352 (Fla. 2d DCA 2000)). A "false conflict" between laws can exist: (1) where the laws of the different sovereigns are the same; (2) where the laws of the different sovereigns are different but would produce the same outcome under the facts of the case; or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws. *Tune*, 766 So.2d at 352 (citing *Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12, 14 (D.D.C. 1997)).

The parties have identified three bodies of law which might apply to the issue of agency: (1) Florida law, based on several Plaintiffs' current residence in Florida; (2) Oklahoma law, based on Thrifty's incorporation and principal place of business in Oklahoma; and (3) South African law, based on the site of the accident.[6] However, both Thrifty and Plaintiffs argue that the same result is compelled by these different bodies of law. For the reasons stated below, the Court agrees. Accordingly, the Court will analyze the issue of agency under all three sets of law.

---

[6]     This Court's previous choice of law analysis considered the law of Ohio based on several Plaintiffs' residence there at the time of the accident. (Doc. No. 190 at 8-9.) Neither party asserts that Ohio law should be applied to the current issue.

III.    **Analysis under Florida, Oklahoma, and South African Law**

A.      **Basic Common Law Concepts**

Before turning to a jurisdiction-by-jurisdiction analysis, a brief background on the common law concepts of agency and *respondeat superior* is necessary.

The general concept of agency encompasses the "legal consequences of consensual relationships in which one person (the 'principal') manifests assent that another person (the 'agent') shall, subject to the principal's right of control, have power to affect the principal's legal relations through the agent's acts and on the principal's behalf." Restatement (Third) of Agency introductory cmt. (2006). Many questions governed by common law agency principles involve the legal consequences of an agent's interactions with third persons. *Id.* In such cases, two separate but related agency concepts are relevant: (1) authority; and (2) *respondeat superior*. *See id.* §§ 2.01-.04.

The concept of "authority" determines when a principal is bound by the agent's transactions with third parties. *See id.* §§ 2.01-.03, 6.01-.03. Actual authority is created when the principal either explicitly or implicitly authorizes the agent to take a certain action. *Id.* §§ 2.01-.02. Apparent authority exists, according to the Restatement (Third), "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03. When an agent acts with either type of authority, the principal may be contractually bound by the agent's dealings. *Id.* §§ 6.01-.03.

*Respondeat superior* is a doctrine that dictates when the principal is liable for its agent's torts. *See id.* §§ 2.04, 7.03, 7.07-.08. Specifically, "[a]n employer is subject to liability for torts committed by employees while acting within the scope of their employment." *Id.* § 2.04. The use of the term "employee," or "servant" in previous Restatements, is notable because an "employee"

is a subspecies of agent "whose principal controls or has the right to control the manner and means of the agent's performance of work." *Id.* § 7.07(3)(a). Thus, "employee" is a narrower category than "agent," and a principal's vicarious tort liability is necessarily narrower than its contractual liability for an agent's dealings.

The Restatement (Third) clarifies the fundamental difference between these two common law concepts:

> The common law of agency in the United States encompasses the principle of *respondeat superior*, which makes an employer, or a nonemployer principal who has the right to direct another's actions, vicariously liable for torts committed by an employee or agent while acting within the scope of employment or other engagement. Doctrines of authority and apparent authority, which principally but not exclusively apply when the focus is transactionally oriented activity by an agent, do not govern or explain the application of *respondeat superior*. Rather, *respondeat superior* is based on the status created by particular types of agency relationships, chiefly employment. The doctrine of scope of employment, although related in some basic respects to the notion of scope of authority, is distinct from the agency-law doctrines that define actual and apparent authority.

*Id.*[7]

---

[7]    Section 7.08 of the Restatement (Third) deals specifically with tortious liability for acts of agents cloaked with apparent authority. That provisions states, "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission." *Id.* The commentary to this section explains that:

> The torts to which this section applies are those in which an agent appears to deal or communicate on behalf of a principal and the agent's appearance of authority enables the agent to commit a tort or conceal its commission. Such torts include fraudulent and negligent misrepresentations, defamation, tortious institution of legal proceedings, and conversion of property obtained by an agent purportedly at the principal's direction.

*Id.* § 7.08 cmt. a. As explained in this Order, *infra*, sections II(B)(1)-(2), Florida and Oklahoma have expanded tort liability for an apparent agent beyond what is permitted by the traditional
(continued...)

**B.     State Law Analysis**

**1.     Florida**

Thrifty argues that summary judgment is warranted under Florida's case law, relying on the Florida Supreme Court's decision in *Mobil Oil Corp v. Bransford*, 648 So. 2d 119 (Fla. 1995) and the Fourth District Court of Appeal's decision in *Madison v. Hollywood Subs, Inc.*, 997 So. 2d 1270 (Fla. 4th DCA 2009).  (Doc. No. 184 at 15-18.)  According to Thrifty, *Bransford* and *Madison* are indistinguishable from this case in that both cases rejected tort claims against a franchisor that were based solely on the appearance of an agency relationship between the franchisor and the tortfeasor-franchisee.  (*Id.*; Doc. No. 191 at 3-5.)  Plaintiffs, on the other hand, argue that agency is a factual issue to be determined by the jury.  (Doc. No. 185 at 9.)  In this case, Plaintiffs contend, "apparent agency"[8] could be found because Thrifty "goes to such lengths to create the appearance of an agency relationship [that] it cannot then renounce such a relationship when it becomes inconvenient."  (*Id.* at 10-11.)  Plaintiffs also argue that the Florida Supreme Court's decision in *Bransford* recognized that a franchisor can be vicariously liable if it "directly or apparently participated in some substantial way in directing or managing acts of the franchisee, beyond the mere fact of providing contractual franchise support activities."  (Doc. No. 198 at 11 (citing *Bransford*, 648 So. 2d at 121).)

*Bransford* is the Florida Supreme Court's most recent analysis of a franchisor's vicarious liability for the torts of its franchisee.  However, earlier case law is necessary to put the holding of *Bransford* in perspective.  As explained above, the common law rule of *respondeat superior* applied

---

[7](...continued)
common law rule and this Restatement provision.

[8]     The terms "apparent agency" and "apparent authority" will be used interchangeably in this Order.

-14-

so that a principal is vicariously liable for the acts of its "employees," or "servants," within the scope of their employment. *E.g.*, Restatement (Third) of Agency §§ 2.04, 7.03, 7.07-.08. In 1971, a Third Circuit Court of Appeals case, *Gizzi v. Texaco, Inc.*, 437 F.2d 308, 309-10 (3d Cir. 1971), held that an oil company could be liable for the torts of a franchisee filling station under a theory of apparent authority, even though the plaintiff lacked sufficient evidence to hold the company liable under the doctrine of *respondeat superior*. *See also* Brett A. Brosset, Note, *Buyers, Beware: The Florida Supreme Court's Abrogation of the Apparent Authority Doctrine Leaves Plaintiffs Holding the Tab for the Torts of Franchisees* – Mobile Oil Corp v. Bransford, 23 Fla. St. U. L. Rev. 837, 839-43 (1996). After *Gizzi*, conflicting case law appeared in the various Florida district courts of appeal, with the Fifth District Court of Appeal applying the "apparent authority" rule to vicarious tort liability and the Fourth District Court of Appeal appearing to reject application of the rule. Brosset, *supra*, at 845-46. In *Orlando Exective Park, Inc. v. Robbins*, 433 So. 2d 491, 492 (Fla. 1983), the Florida Supreme Court approved the Fifth District's rule, holding that the Howard Johnson Corporation could be vicariously liable for an assault committed on a franchisee's premises because "the signs, national advertising, uniformity of building design and color schemes allow the public to assume that this and other similar motor lodges are under the same ownership," *id.* (quoting the lower court's decision).

The Florida Supreme Court partially receded from this position in *Bransford*, 648 So. 2d at 120-21. In that case, a customer was attacked by a Mobil franchisee's employee who had a history of assaulting customers, and the plaintiff sued Mobil, the franchisor, on a theory of apparent authority. *Id.* at 120. The evidence indicated that: Mobil owned the property on which the station was located; Mobil trademarks and symbols were used throughout the premises; the franchise

agreement required the use of Mobil symbols and the sale of Mobil products; and Mobil allegedly

sent representatives to the station to provide routine support services. *Id.* The court reasoned:

> In today's world, it is well understood that the mere use of franchise logos and
> related advertisements does not necessarily indicate that the franchisor has actual or
> apparent control over any substantial aspect of the franchisee's business or
> employment decisions. Nor does the provision of routine contractual support
> services refute this conclusion. Here, the contract itself expressly stated that Berman
> "is an independent businessman, and nothing in this contract shall be deemed as
> creating any right in [Mobil] to exercise any control over, or to direct in any respect,
> the conduct or management of [the] business."

*Id.* (alterations by *Bransford* court). The court continued, "Franchisors may well enter into an

agency relationship with a franchisee if, by contract or action or representation, the franchisor has

directly or apparently participated in some substantial way in directing or managing acts of the

franchisee, beyond the mere fact of providing contractual franchise support activities." *Id.*

The court then recognized that the concept of "apparent agency" applied to the case and cited

its three-part test: "(a) a representation by the purported principal; (b) a reliance on that

representation by a third party; and (c) a change in position by the third party in reliance on the

representation." *Id.* at 121. According to the court, the "first of these elements" was "primarily

relevant," and, under the facts alleged, the plaintiff had failed to demonstrate "the minimum level

of a 'representation' necessary to create an apparent agency relationship." *Id.* The court concluded

by distinguishing *Orlando Executive Park* as a case where the "franchisor actually operated several

components within the complex in question" and thus "obviously and directly 'represented' to the

public that the franchisor was in substantial control of the business." *Id.*

The *Bransford* opinion preserves a modified version of apparent authority called the

"common knowledge" rule through which courts are directed to presume that members of the public

know that an ordinary franchise relationship is not a representation of agency. *See id.* at 120-22;

Robert W. Emerson, *Franchisor's Liability When Franchises Are Apparent Agents: An Empirical and Policy Analysis of "Common Knowledge" About Franchising*, 20 Hofstra L. Rev. 609, 645-46 (1992).[9] Thus, for tort liability to attach, the franchisor must make a representation that goes beyond the basic franchise relationship "by indicating that the franchisor was in substantial control of the business." *Bransford*, 648 So. 2d at 121; *see also* David A. Beyer, *Franchise Vicarious Liability in Florida: A Survey and Recent Developments*, 69 Fla. B. J. 62, 66 (1995) ("[V]icarious liability on the grounds of apparent agency may no longer exist as a viable cause of action in Florida. In most cases, plaintiffs will not be able to prove apparent agency since [they] will not be able to establish the required element of the franchisor's representation of agency status."). At the same time, the franchisor may still be liable when it "has participated in some substantial way in directing or managing acts of the franchisee," *Bransford*, 648 So. 2d at 120, a standard similar in substance to the traditional *respondeat superior* test. *See, e.g.*, Restatement (Third) Agency § 7.07(3)(a).

The holding in *Bransford* has been applied several times by Florida's lower courts. Recently, in *Madison v. Hollywood Subs, Inc.*, 997 So.2d 1270, 1270-71 (Fla. 4th DCA 2009), the Fourth District Court of Appeal upheld the trial court's dismissal of a complaint against a fast food franchisor that had been sued on apparent authority grounds for the franchisee's alleged negligence. According to the complaint, the decedent was killed during an altercation outside the restaurant, and the plaintiff contended that the franchisee had failed to provide adequate security for its patrons. *Id.* at 1270. The court observed that "[t]he agreement provided that the franchisee is an independent

---

[9] Using survey data, Emerson argues that this conclusion is actually a legal fiction; most respondents did not know that national brand-name stores were locally operated. Emerson, *supra*, at 651-56. Further, many respondents did not understand the fundamental concepts underlying the franchise system. *Id.* at 656-61.

contractor and not an agent for the franchisor.  Plaintiff refers to the franchise agreement to establish control; however, the only control provided by the agreement was to insure uniformity in the standardization of products and services offered by the restaurant."  In a somewhat terse holding, the court cited *Bransford* and then concluded that "the franchise agreement on which plaintiff relied to state a cause of action based on agency did not make the franchisor responsible for this type of incident."  *Id.* at 1271.

In *Roessler v. Novak*, 858 So. 2d 1158, 1162 (Fla. 2d DCA 2003), the Second District Court of Appeal applied *Bransford* to a case where the plaintiff contended that a hospital held out a doctor to be its agent.  The court began its analysis by noting that apparent authority is not created by the "subjective understanding of the person dealing with the purported agent from appearances created by the purported agent himself."  *Id.*  "Rather, apparent authority exists only where the principal creates the appearance of an agency relationship."  *Id.*  The court concluded that an issue of fact existed regarding the issue of apparent authority because the hospital maintained a radiology department within its grounds and used the doctor's practice to provide all radiological services; viewing the evidence in the plaintiff's favor, it represented to the patient that the doctor was its agent.  *Id.* at 1262-63.  Likewise, in *Ilgen v. Henderson Props., Inc.*, 683 So. 2d 513, 514-15 (Fla. 2d DCA 1996), the Second District Court of Appeal found that an issue of fact existed regarding apparent authority in a case where the plaintiffs sued a home construction franchisor, Ruttenburg, based on a contract with a franchisee stating that the home to be built was "Contractor's Arthur Ruttenburg Custom home . . . ."  The court distinguished *Bransford* based on the existence of a contract between the franchisee and third party that "invok[ed] the name of the purported agent

[sic]¹⁰ in its key clause." *Id.* at 514. The contract, which had been provided to the franchisee by Ruttenburg, communicated to the plaintiff that the "franchisor [was] exercising substantial control." *Id.* at 515.

Applied to this case, *Bransford* and its interpretive case law mandate summary judgment on the issue of vicarious liability. Although *Bransford* does not explain exactly what constitutes a representation that the franchisor is "in substantial control of the business," the case does make clear that a franchisee's mere use of the franchisor's trademarks is insufficient as a matter of law to establish the reliance prong of apparent authority. *Bransford*, 648 So. 2d at 121. Critically, Plaintiffs identify no representations in this case that evince more than the basic franchise relationship described in *Bransford*. For instance, this case contains none of the indicia of greater control found in *Orlando Exectuive Park*, *Roessler*, or *Ilgen*. Unlike *Orlando Executive Park* and *Roesller*, SAFY's Port Elizabeth location is not part of a larger complex that is owned and operated by Thrifty. *Cf. Orlando Exective Park, Inc.*, 433 So. 2d at 494; *Roessler*, 858 So. 2d at 1162. Unlike *Ilgen*, the Millers were not presented with a contract creating the impression that SAFY was performing a service on behalf of Thrifty. *Ilgen*, 683 So. 2d at 514-15. To the contrary, the contract featured two distinct logos next to Thrifty's, explicitly stated that the lessor was Springs Car Wholesalers, and indicated that Springs Car Wholesalers was an independent licensee. In light of *Bransford*, reliance on such representations showing a basic franchise agreement to create a cause of action based on vicarious liability is unreasonable as a matter of law.

---

¹⁰    Presumably, the court meant to say "principal"; the mention of the purported agent's name in the contract would be inconsequential given that the contract was between the third party and the purported agent.

Plaintiffs attempt to avoid this result by arguing that Thrifty "directly or apparently participated in some substantial way in directing or managing acts of the franchisee, beyond the mere fact of providing contractual franchise support activities." (Doc. No. 198 at 11 (citing *Bransford*, 648 So. 2d at 121).) However, as explained above, nothing in the agreement goes beyond a typical franchise relationship and into the realm of "directing or managing" SAFY's business. Thrifty permitted SAFY to use its trade dress and reservation system. In turn, SAFY is obligated to: have a full time manager; have a separate telephone number for customer calls; maintain "clean, orderly, and safe" locations; comply with Thrifty's "customer system dispute resolution program"; avoid using multiple trademarks; and identify itself as an independent licensee. In addition, SAFY is required to meet certain performance benchmarks, promote its business, and carry insurance. The agreement specifically labels SAFY as an independent contractor.

Such conditions are typical of a franchise relationship; their point, as summarized by Thrifty's operations manager, is to ensure consistency throughout the franchise network. (Doc. No. 184-9 at 4.) The most detailed instructions in the agreement involve SAFY's use of Thrifty's trade dress; other instructions regarding the conduct of SAFY's business, such as maintaining "clean, safe, and orderly" locations, are left vague. The agreement does not instruct SAFY on what cars to buy, nor does it allow Thrifty to dictate SAFY's hiring practices. Representatives of both SAFY and Thrifty testified that Thrifty plays no role in managing the day-to-day operations of SAFY. On the whole, the operative facts of this case are indistinguishable from *Bransford*.

As a related matter, it is unclear from Plaintiffs' Motion and Response whether they seek to hold Thrifty liable under traditional *respondeat superior* principles; however, it is clear that the record contains insufficient evidence to hold Thrifty liable under such a theory. Florida law utilizes

the ten factor test set forth by the Restatement (Second) of Agency to make this determination. *Harper v. Toler*, 884 So. 2d 1124,1130-31 (Fla. 2d DCA 2004) (summarizing the ten factors).[11] Despite the numerosity of factors to consider, only one potentially weighs in favor of finding SAFY to be an "employee" of Thrifty. *See id.* ("[W]hether or not the work is a part of the regular business of the employer."). The most important factor, "the extent of control which, by the agreement, the master may exercise over the details of the work," weighs heavily against employee status because the agreement between Thrifty and SAFY is "results" oriented instead of "means" oriented. *Id.* at 1131 ("A control directed toward means is necessarily more extensive than a control directed toward results. Thus, the mere control of results points to an independent contractor relationship; the control of means points to an employment relationship."). This characteristic is demonstrated by

---

[11] The full test is as follows:

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

    (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
    (b) whether or not the one employed is engaged in a distinct occupation or business;
    (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
    (d) the skill required in the particular occupation;
    (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
    (f) the length of time for which the person is employed;
    (g) the method of payment, whether by the time or by the job;
    (h) whether or not the work is a part of the regular business of the employer;
    (i) whether or not the parties believe they are creating the relation of master and servant; and
    (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 202 (1958).

the agreement's emphasis on benchmarks as a measure of performance, generalized operating guidelines, and the franchisee's compensation through its own revenue. In sum, no reasonable jury could find the *respondeat superior* test met on the facts of this case. *Compare F.T. Blount Funeral Home v. City of Tampa*, 627 So. 2d 1272, 1274-75 (Fla. 1st DCA 1993) (summary judgment appropriate where the evidence clearly weighed in the defendant's favor on four factors, including the issue of control), *and Delco Indus., Inc. v. Dep't of Labor & Employment Secur.*, 519 So. 2d 1109, 1110 (Fla. 4th DCA 1988) (determining that telephone solicitors were not employees on a review of an administrative decision regarding tax liability; the issue of "control" weighed in the defendant's favor because it only monitored them to ensure that they accurately represented its products and did not otherwise direct their activities), *with Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 854-55 (Fla. 2003) (determining that an issue of fact existed whether an HMO was vicariously liable for member doctors' torts because the HMO determined which providers were part of its network, HMO patients were required to use those doctors, and the HMO had the right to control important aspects of patient care), *and Parker v. Domino's Pizza, Inc.*, 629 So.2d 1026, 1028 (Fla. 4th DCA 1993) (finding that an issue of fact existed with respect to *respondeat superior* where a Domino's franchisee was required to adhere to a "veritable bible for overseeing a Domino's operation," including specific guidance on preparation of products, advertising, maintaining books, organization, and sanitation).

### 2. Oklahoma

Thrifty argues that Oklahoma law precludes vicarious liability for much the same reasons that Florida law does. (Doc. No. 184 at 18-20.) Plaintiffs agree that Oklahoma law is similar to Florida's law, but they contend that a finding of agency is compelled. (Doc. No. 185 at 9.)

As the parties recognize, Oklahoma's case law on the issue of vicarious liability is substantially similar to Florida's case law. Originally, Oklahoma law imposed vicarious tort liability only in cases where the *respondeat superior* test was satisfied. *Coe v. Esau*, 377 P.2d 815, 819 (Okla. 1963). In *Coe*, a motorist sued Continental Oil Company for a filing station operator's negligent repairs. *Id.* at 817. Although the court did not expressly raise the issue of apparent agency, it observed that "[i]t is indeed a matter of common knowledge and practice that distinctive colors and trademark signs are displayed at gasoline stations by independent dealers of petroleum product suppliers" *Id.* at 818. Ultimately, the court concluded that representations, without a showing of control or a right of control, were insufficient to meet the plaintiff's burden of proving the existence of a master and servant relationship. *Id.* at 818-19.

Later, the Oklahoma Supreme Court appeared to recognize a version of the apparent authority rule that was limited by the "common knowledge" exception described above. *Stevens v. Yamaha Motor Co., Ltd. Japan*, 627 P.2d 439, 441-42 (Okla. 1981). The facts of *Stevens* were similar to *Coe*: a motorist received negligent repairs at a service station franchise, but there was no evidence in the record that the franchisor exercised control over the franchise. *Id.* at 440. The court cited to *Gizzi, Inc.*, 437 F.2d at 309-10, but distinguished it as a case where the franchisor "exercised control over the activities of the service station." After citing two state cases recognizing the "common knowledge" rule, the court quoted one court's conclusion that "it is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers." *Id.* Thus, the plaintiff's belief that he was being serviced by the franchisor was "not sufficient to withstand summary judgment." *Id.*

Applied to this case, Oklahoma's law warrants summary judgment in Thrifty's favor on the issue of vicarious liability. Like Florida law, Oklahoma law holds that reliance on trademarks, signs, and logos as representations of agency is unreasonable as a matter of law. *Stevens*, 627 P.2d at 441-42; *Coe*, 377 P.2d at 819. Further, as explained above, Thrifty did not exercise the level of control necessary to support a finding of *respondeat superior*. *Coe*, 377 P.2d at 818 ("Whether relation of master and servant does in fact exist between lessor of gasoline station and its lessee so as to render the doctrine of *respondeat superior* applicable, depends on whether lessor has the right to control, or exercises the right to control, lessee in the details of the work to be performed in the operation and management of the station."); *Patton v. Mem'l Hosp. of S. Okla., Inc.*, 895 P.2d 298, 300 (Okla. Civ. App. 1995) (holding that a demonstration of "control and direction" is necessary to support a *respondeat superior* claim). Accordingly, Thrifty is entitled to summary judgment on this issue.

**3.      South Africa**

Thrifty argues that "South Africa law on Agency is similar to Florida law in that a principal is not liable for the acts of its independent contractor unless it exerts some measure of control over the independent contractor." (Doc. No. 184 at 20.) According to Thrifty's Motion, South Africa recognizes vicarious liability "where the agent is a servant but not where the agent is a contractor, sub-contractor[,] or a servant of a contractor or sub-contractor." (*Id.* at 21 (quoting *Chartaprops 16 (Pty) Ltd and Another v Silberman* 2009 (1) SA 265 (SCA) ¶ 6  (S. Afr.)[12]).) Further, when the agent causes harm as an independent contractor, the principal may be liable only if it assigns a non-delegable duty to the contractor or is otherwise negligent for allowing the harm to occur. (*Id.* at 21-

---

[12]      The copy of this case provided to the Court is not paginated.  Therefore, pinpoint citations will be to the paragraph.

22.) However, the majority opinion of *Silberman*, recently decided by South Africa's highest court for matters of civil law, casts doubt on the viability of the non-delegable duty rule. *Silberman*, 2009 (1) SA 265 ¶¶ 7-45 (recognizing the "the general rule of no liability of a principal for the civil wrongs of an independent contractor except where the principal was personally at fault," criticizing the concept of a non-delegable duty as an imprecise restatement of general negligence principles, and concluding that there "are few operations entrusted to an independent contractor by a principal that are not capable, if due precautions are not observed, of being sources of danger to others"). Plaintiffs do not address South African law regarding vicarious liability in their Motion for Partial Summary Judgment or in their Response to Thrifty's Motion.

The materials provided to the Court indicate that the law of South Africa recognizes the same distinction between an "employee" (or "servant") and an "independent contractor" as Anglo-American law. Thus, for the reasons stated above with respect to Florida and Oklahoma law, the facts of this case are insufficient as a matter of law to satisfy the *respondeat superior* test. Further, as stated in Section I, *supra*, Plaintiffs have not presented any evidence capable of demonstrating that Thrifty is directly liable for their injuries; therefore, Thrifty cannot be held liable for failing to take appropriate precautions against harm. Accordingly, summary judgment is warranted under South African law. *See Silberman*, 2009 (1) SA 265 ¶¶ 6, 48 (summarizing the *respondeat superior* and reasonable care standards).

## IV.  Claims Against John Doe Manufacturer

Plaintiffs assert claims against "John Doe Manufacturer" in their Amended Complaint. However, Plaintiffs have not named this party or served it in the time since this litigation began in August of 2007. "A plaintiff's failure to identify and serve unnamed defendants in a timely fashion

requires dismissal." *Williams v. Barrett*, 287 F. App'x 768, 770 (11th Cir. 2008).  Further, a defendant must be served within 120 days after the complaint is filed.  Fed. R. Civ. P. 4(m).  If no service has been made in that time, the Court may dismiss the claim without prejudice after giving notice to the plaintiff.  *Id.*  Because John Doe Manufacturer has not been named or served, the Court will dismiss Plaintiffs' claims against it without prejudice, unless Plaintiffs move, within eleven days from the date of this Order, to amend their Amended Complaint and to allow untimely service of this party.

### Conclusion

For the foregoing reasons, the Consolidated Motion for Summary Final Judgment of Defendant Thrifty Rent-A-Car System, Inc. and Memorandum of Law (Doc. No. 184, filed Apr. 1, 2009) is **GRANTED**.  The Court gives notice to Plaintiffs that it intends to dismiss the claims against Defendant John Doe Manufacturer unless Plaintiffs move, within eleven days from the date of this Order, to amend their Amended Complaint and allow untimely service of this party.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on June 1, 2009.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record